UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
LOCAL 8027, AFT-NEW HAMPSHIRE, AFL- :
CIO, RYAN RICHMAN, JOHN DUBE and :
JOCEYLN MERRILL, teachers in the New :
Hampshire Public Schools, and KIMBERLY :
GREEN ELLIOTT and MEGHAN EVELYN :
DURDEN, parents or guardians of children in the :
New Hampshire public schools.            : No. _____
                                         :
                            Plaintiffs,  :
                   - against -           :
                                         :
FRANK EDELBLUT, in his Official Capacity as :
Commissioner of the DEPARTMENT OF :
EDUCATION ("DOE"), CHRISTIAN KIM in his :
Official Capacity as the Chair of the NEW :
HAMPSHIRE COMMISSION ON HUMAN :
RIGHTS, and JOHN FOMELLA in his Official :
Capacity as ATTORNEY GENERAL of the State :
of New Hampshire.                        :
                            Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs, LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN,

JOHN DUBE, AND JOCELYN MERRILL, individual teachers in the New Hampshire Public

Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVEYLN DURDEN, individual

parents of children in the New Hampshire public schools, through their attorneys Nolan Perroni,

P.C., Stroock & Stroock & Lavan LLP, Phillips, Richard & Rind, P.C., David Strom, Esq., and

Selendy & Gay PLLC, for their complaint against Commissioner Frank Edelblut, in his official

capacity as Commissioner of DOE, Christian Kim in his Official Capacity as Chair of the New

Hampshire Commission on Human Rights and John Fomella in his Official Capacity as Attorney

General of the State of New Hampshire allege as follows:

## NATURE OF THE ACTION

1.     This action for declaratory and injunctive relief challenges the constitutionality and legality of recently enacted New Hampshire statutory provisions 297 and 298 of 2021 House Bill 2 ("297 and 298" "HB 2"), codified at N.H. REV. STAT. ANN. ("RSA") 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354A:34; and RSA 193:40, all enacted June 25, 2021, which together have come to be known as the "Divisive Concepts Statute" (*see infra*, n.12-13).

2.     Concisely put, the Divisive Concepts Statute was designed to limit teaching in New Hampshire of ideas and societal concerns not to their liking, thereby curtailing speech, limiting the free exchange of ideas within our classrooms and depriving New Hampshire students of their constitutionally and statutorily guaranteed right to an adequate education.  The resulting enactment is at once unconstitutionally vague in violation of the Fourteenth Amendment of the United States Constitution, chills teacher speech in violation of the First Amendment and conflicts with and compels abridgment of New Hampshire's Constitution and laws, thereby creating further vagueness, fear and uncertainty as to what New Hampshire teachers may teach and as a result hurts New Hampshire's students.

3.     The Divisive Concepts Statute invites partisanship into our schools and deputizes private, politically-motivated individuals to enforce its vague proscriptions.  Indeed, in recent weeks, the Divisive Concepts Statute has been seized upon by radical political groups to rationalize an offer of an economic "bounty" for informers who lodge, on a recently created State-established and Department of Education maintained website, complaints about public school teachers.  This threat of a "bounty" looms large in addition to obvious reputational consequences and penalties, including firing, that the Defendant Education Commissioner may thereafter seek to impose, underscoring the Statute's chilling effect not just on teachers' constitutionally

protected rights but, as a result, on the education students must have to prepare for life, college, careers and citizenship. Indeed, teachers, including a Plaintiff in this action, have been made the subject of online harassment, obscenities and vicious attacks as a direct result of the climate of political intimidation created by and with the facilitation of various Defendants.

4. The "culture wars" have no place in New Hampshire's classrooms. Our public school teachers and support staff are dedicated public servants who have stepped up and devoted themselves beyond measure during the pandemic to continue to teach our children. Yet, they are being politically targeted and threatened with public shaming and undeserved disciplinary proceedings (not to mention the cost of defending themselves) for doing their jobs in accordance with the curriculum formally adopted by the state. New Hampshire parents, too, are entitled to send their children to school, expecting a full and robust exchange of ideas in the classroom, uncorrupted by censorship and extremist partisanship.

5. Because it is hopelessly and unconstitutionally vague on its face, the State and its agencies have on at least two separate occasions since its passage weighed in to attempt to clarify the meaning and scope of the Divisive Concepts Statute. In July 2021, the Commission for Human Rights, Department of Justice and Department of Education issued a guidance document entitled "*Frequently Asked Questions*: *New discriminatory practice prohibitions applicable to public prohibitions applicable to k-12 educational programs*"[1], (the "FAQ"), in an attempt to define certain ambiguous words in the statute and identify what teachers may (and may not) teach. After it became clear that the attempted clarification had fallen woefully short, on September 7, 2021, in response to a request from the Human Rights Commission (the same State agency that previously issued the FAQ), the Attorney General again attempted in a formal opinion

---

[1] Dep't of Educ., Comm'n for Human Rights and Dep't of Justice, *Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs*, https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf (last accessed Dec. 10, 2021).

to resolve the confusion and identify what is and what is not prohibited by the Statute.[2]  The need

for repeated clarification and restatement by each of these state entities underscores the law's

vagueness and the unquestionable difficulty public school teachers have in understanding it, much

less complying with it while, at the same time, adhering to conflicting state laws and mandated

curriculum.

6.        While the Attorney General's September 7th Opinion (together with the July 21st

FAQ's) make strides towards interpreting, and seemingly limiting some of the unconstitutional

educational restrictions imposed on teachers by the Divisive Concepts Statute, it does not fully

cure the statute's defects—particularly as to the unbridled claims of third party bounty hunters or

the cadre of informers assembled through the Department of Education's website.  Nor is it

comprehensive or binding authority.  And while the Attorney General's opinion is dated

September 7, 2021, as of the date of this complaint (December 13, 2021), the Department of

Education does not even reference it much less include it as part of its purported governing

interpretations listed on the Department of Education website.  Thus, teachers now are placed in

the impossible position of interpreting a statute that the Attorney General, the State Human Rights

Commission and even the Department of Education agree is confusing and one that on its face

conflicts with state education laws and curriculum mandates and, which, if the teachers'

interpretation as non-lawyers is in error, subjects them to reputational injury, disciplinary

procedures and potentially the loss of their livelihoods, not to mention the vengeance of bounty

hunters empowered by the Divisive Concepts Statute to maintain harassing litigation.  The

intervention and imprimatur of this Court through declaratory relief thus is necessary (a) to clarify

the Divisive Concepts Statute, and correct it's infirmities, starting with, but not limited to, the

---

[2] Attorney General Dep't of Justice, Attorney General Opinion No. 2021-01, Request for Attorney General's Opinion regarding new anti-discrimination protections (Sept. 7, 2021), https://www.doj.nh.gov/public-documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf.

direction recognized as essential by the Attorney General in his formal Opinion, or (b) invalidate it, particularly because the statute authorizes private individuals in this highly charged political environment to bring private suits against individual teachers to enforce its ambiguous provisions, regardless of any limiting language from the Attorney General, or otherwise.

## THE PARTIES

7. Plaintiff Ryan Richman is a high school World History teacher at Timberlane, Regional High School.  Since the start of the school year, the Divisive Concepts Statute has had the effect of chilling Mr. Richman's ability to provide his students with the nature, content and quality of education guaranteed and mandated by the New Hampshire Constitution and laws.  His interaction with his students has been materially curtailed given Mr. Richman's uncertainty as to what he can and cannot teach and what questions he can and cannot answer.  As a result, his students – along with the students of all other New Hampshire teachers in this complaint – are put at a competitive disadvantage as they are not receiving the comprehensive education to which they are entitled under New Hampshire law, and which other students in the United States are receiving.

8. Plaintiff John Dube is a high school U.S. History and AP U.S. History teacher at Timberlane Regional High School.  After the Divisive Concepts Statute was passed, Mr. Dube signed an online petition promising to teach "honest" history.  A New Hampshire rightwing group published all of the names of teachers who signed the petition, pledging to "shame" them.  Mr. Dube was subject to online harassment, threats and obscenities for simply doing his job in the classroom – requiring federal and local law enforcement intervention.  He continues to fear for his own personal safety and, in fact, has had to install personal security and safety equipment at his home in light of the threats.  *See* Exhibit A.

9.      Plaintiff Jocelyn Merrill is a ninth grade English teacher at Nashua High School North.  She has been teaching for 10 years.  Since the Divisive Concepts Statute was passed, Ms. Merrill has limited her classroom discussion of race to specific passages in assigned literature and has avoided any discussion of racism's systemic impact with her students.

10.     Plaintiff Kimberly Green Elliott is a Reading Specialist at Fairgrounds Middle School and lives in Merrimack, New Hampshire.  Ms. Elliot has two children, a daughter who graduated from Merrimack public schools and is now in college, and a son, who currently attends Merrimack High School.  Ms. Elliott believes the Divisive Concepts Statute will prevent her son from receiving a full and robust education for, among other reasons, those highlighted in paragraph 6, *supra*.  In fact, since the Divisive Concepts Statute was passed, Ms. Elliott has observed a noticeable difference in the breadth of the education her son has received and has even seen one of her son's teachers self-censor on certain controversial topics.

11.     Plaintiff Meghan Evelyn Durden is an Art Teacher at Charlotte Avenue Elementary School. Her daughter is in public elementary school in Nashua.  As described in paragraph 6, *supra*, Ms. Durden believes the Divisive Concepts Statute will prevent Ms. Durden's daughter from receiving a full and robust education for, among other reasons.

12.     Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO is a labor union representing approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty.  Local 8027 is a member of the New Hampshire AFL-CIO, and is the state affiliate for the American Federation of Teachers with more than 3,000 local affiliates nationwide, 43 state affiliates, and more than 1.7 million members.

13. Defendant New Hampshire Education Commissioner Frank Edelblut, in his Official Capacity as Commissioner of DOE, is tasked under RSA § 21-N:4 with "[e]stablishing the organizational goals of the department and representing *the public interest* in the administration of the functions of the department of education and being responsible to the governor, the general court, and the public for such administration." (Emphasis added).

14. Defendant Christian Kim, in his Official Capacity as Chair of the New Hampshire Commission for Human Rights, is tasked with enforcing the law against discrimination and to "receiv[ing], investigat[ing] and mak[ing] findings" on complaints. Relevant here, the Commission for Human Rights is empowered under the Divisive Concepts Statute to enforce its provisions.

15. Defendant John Fomella is the Attorney General of the State of New Hampshire and is the chief legal officer in the State. His duties and responsibilities include, among others, addressing challenges to New Hampshire statutes and related constitutional challenges, the subject of these proceedings.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and the laws of the United States.

17. Venue is proper in this District under 28 U.SC. § 1391(b) because at least one Defendant resides within this District, all Defendants reside in the State in which this District is located, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

18. The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983.

19.     The Court has jurisdiction of claims viewed as being cognizable only under state law as a matter of supplemental jurisdiction. 28 U.S.C. § 1367.

## BACKGROUND

20.     Education is a vital function of state and local governments.  Public education is the lifeblood of our democracy and enables our children to be prepared for their lives, for college and career, as well as for civic participation.  As the Supreme Court famously put it, "[i]t is the very foundation of good citizenship."  *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954), supplemented sub nom, *Brown v. Bd. Of Educ. of Topeka, Kan,* 349 U.S. 294 (1955).

21.     Within our free and diverse educational system, broad exposure and the freedom to explore and examine areas of scholarship, art, history and science, together with the development of critical basic skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a democratic society.  Any attempt to diminish public education through misinformation, selective teaching or censorship directly threatens both our young citizens and our democracy.  Critical thinking and the ability to independently and freely evaluate ideas exchanged in public debate are core skills at the foundation of all educational training.

22.     Aside from being a country devoted to freedom, democracy, opportunity and justice for all, what sets our great nation apart is its unique diversity – of race, ethnicity, religion, viewpoint, among many others – and our steadfast commitment to celebrate that diversity rather than muzzle it.

23.     Politically-driven censorship (reminiscent of the 1933 book burnings here, or in Germany or in Austria) has no place in a vital and vibrant America, and is especially unwelcome in American classrooms.  Our judiciary understands the anathema that censorship represents and the need to protect against it.  Nearly a century ago, the United States Supreme Court recognized

that "[m]ere knowledge" of concepts, perspectives, and events "cannot reasonably be regarded as harmful" when taught in public schools. *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923). That is particularly true today, when students, armed with the internet and other technological advances, have free and unfiltered access to more information than at any other time in history. The public school classroom – the cornerstone of a sound education and educational system – must be a safe forum for the free exchange of ideas and information. It is a young American's initial and foundational exposure to the importance of independent thought and expression, and a critical first component for the cultivation of democratic ideals.

24. New Hampshire has long been a beacon of American public education, with a rich history of preparing well-rounded students for successful participation in our ever changing society. These basic precepts have been acknowledged and practiced in New Hampshire's public education system for decades. Indeed, the need for a diverse and well-rounded educational experience is enshrined in the New Hampshire Constitution which guarantees a minimally "adequate education," and in case law explaining the touchpoints of such an education. Thus, New Hampshire's highest court has made clear that:

> Given the complexities of our society today, the State's constitutional duty [to provide a constitutionally adequate education] extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas.

*Claremont Sch. Dist. v. Governor*, 138 N.H. 183, 192 (1993) (*Claremont I*). Indeed, in the progeny of *Claremont I* the principles of curricular openness have consistently been strengthened and reiterated.

25. New Hampshire's uniform state educational standards contemplate that students will be engaged and challenged on a diversity of topics even in those instances where confronting

certain materials or topics may cause discomfort (*e.g.*, historical events such as the Cocheco

Massacre and its aftermath[3]) but at the same time teach vital lessons. For example, New

Hampshire has long mandated by statute that in all public and private schools, there shall be

courses teaching about "intolerance, bigotry, antisemitism, and national, ethnic, racial, or

religious hatred and discrimination *[that] have evolved in the past, and can evolve, into genocide

and mass violence"* and *"to prevent the evolution of such practices"* in the future.[4] (Emphasis

added). New Hampshire law thus requires students to examine – and it follows that teachers shall

provide the instruction for students to learn – controversial events from multiple perspectives and

ideologies and learn to defend and challenge differing views on a wide variety of topics. In short,

New Hampshire state law promises to develop students into well-rounded, well-educated young

adults who are prepared to embrace all the challenges, complexities, privileges and

responsibilities of American citizenship, who are prepared to live in an increasingly diverse

world, and who can compete successfully in the New Hampshire, national and global economies.

The accomplishment of that goal has long been a hallmark of New Hampshire and of its

educational system. Parents rely on New Hampshire's public schools to educate their children

consistent with those standards. And every year, high school seniors seek their degrees to prepare

them for the workforce, college, and whatever else may lay ahead of them, assured, consistent

with those standards, that they have acquired the necessary knowledge and skills to survive and

thrive in a complex, ever-changing, competitive world.

    A.     *The Divisive Concepts Statute*

    26.     On June 25, 2021, New Hampshire lawmakers launched a devastating blow to the

education New Hampshire parents have come to expect and thrust upon New Hampshire's

---

[3] *See* The Dover, N.H. Public Library, Dover History, https://www.dover.nh.gov/government/city-operations/library/history/the-cochecho-massacre.html (last accessed Dec. 10, 2021).
[4] *See* RSA § 189:11(i)(j).

teachers an impossible predicament. Rather than uphold the longstanding tradition of educational excellence, New Hampshire legislators, as part of a political arrangement necessitated by a deadline for the timely enactment of the biennial state budget, accepted a falsely-premised national political narrative of opposition to "political correctness" by enacting the statute that is the subject of this litigation, RSA § 193:40.

27.     They did so in the wake of nationwide efforts to politicize and censor education.[5] As his term in office drew to a close, President Trump established the "1776 Commission," a group created to "promote patriotic education,"[6] defined by its opposition to a controversial theorem, The Critical Race Theory ("CRT"), which they termed "toxic propaganda"[7], the *New York Times*' 1619 Project, and the late Howard Zinn, author of *A People's History of the United States.* President Trump also issued a November 2020 Executive Order prohibiting federal institutions from providing diversity and inclusion training and discussing topics about systemic racism, white privilege and other race and gender bias issues.[8] Willingness to pursue such mandates for thinking, learning and teaching became for some the political litmus test for educational existence.

28.     Nonprofit organizations challenged the above Executive Order in federal court, arguing that it violated their free-speech rights and hampered their ability to conduct their businesses, including their ability to conduct training for their workforce on topics such as "implicit bias." A federal judge agreed, enjoining *on a nationwide basis* the enforcement of the Executive Order restraining the education and training of federal employees respecting "divisive

---

[5] Adam Harris, *The GOP's 'Critical Race Theory' Obsession*, THE ATLANTIC (May 7, 2021), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[6] Olivia B. Waxman, *Echoing Decades of Fighting Over U.S. History Classrooms, President Trump Announces a Push for 'Patriotic Education,'* TIME (Sept. 17, 2020), https://bit.ly/3xs1qHX.
[7] *Id.*
[8] Establishing the President's Advisory 1776 Commission, Pres. Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2, 2020).

concepts" (*i.e.*, race and gender), as violative of the First Amendment.[9]  With bipartisan support,

President Biden rescinded the order shortly after taking office,[10] thus mooting the litigation.

29.     Nevertheless, as one commentator aptly put it, the rebranding of the "critical race

theory was already a part of the conservative lexicon" by that point.[11]  Supporters of the "divisive

concepts" ban rushed to generate a rash of proposed state legislative measures in various states

designed to replicate, if not expand, the federal constraints that had just been enjoined based on

serious constitutional concerns.

30.     Spurred on by committed ideological zealots who wanted to re-write history, some

New Hampshire politicians were persuaded to follow suit.  After unsuccessfully attempting to

pass stand-alone legislation explicitly banning the teaching of "divisive concepts" related to race

and gender, the Legislature included prohibitions against teaching in order to gain the requisite

votes to timely pass the biannual $13.5 billion state budget bill (an acutely time sensitive measure

which if not enacted precisely in accordance with sensitive timelines would cripple the state).

31.     The new bill created sections 297 and 298, and to conceal its true meaning and

purpose, was entitled "Right to Freedom From Discrimination in Public Workplaces and

Education" (June 25, 2021) (the "Teaching Discrimination Statute").  It was joined with

contemporaneously enacted amendments to RSA § 354-A:30-34 (the "Contemporaneous

Amendments"),[12] into a single bill (HB 2), skillfully crafted to conceal through ambiguity the true

censorship purposes of its architects.[13]

---

[9] *See Santa Cruz Lesbian and Gay Community Center v. Trump,* 508 F. Supp. 3d 521 (N.D. Cal. 2020).
[10] Harris, *supra* n.5.
[11] *Id.*
[12] The Contemporaneous Amendments include: "354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education;" "354-A:31 Prohibition on Public Employers;" "354-A:33 Protection for Public Employees," and "354-A:34 Remedies").
[13] The full text of the operative provisions of HB 2, the Budget Bill which added the above-cited provisions as adopted, is attached hereto as Appendix A.  For convenience, that portion which is the focus of these proceedings and is captioned "*Prohibition on Teaching Discrimination*" is in full text as follows:

32.     In their effort to legislate around expressly banning CRT and related topics, the legislative sponsors drafted the Divisive Concepts Statute with language that is vague beyond comprehension and is one that flies squarely in the face of the United States Constitution and New Hampshire statutory and constitutional law.  The Divisive Concepts Statute was broadly couched as seemingly aimed at prohibiting teaching that "an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously."

33.     Similarly, the measure was cast as also prohibiting teaching that (i) "people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status,

---

"91:298 New Section; Prohibition on Teaching Discrimination. Amend RSA 193 by inserting after section 39 the following new section:

193:40 *Prohibition on Teaching Discrimination*. I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the *historical existence* of ideas and subjects identified in this section.

III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V. For the purposes of this section," educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term. 91:299 Severability. If any provision of sections 297-298, or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby.

91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.

mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard [sic] to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin" or (ii) that one's "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

34.     Importantly, the statute authorizes "*[a]ny person* claiming to be aggrieved by a violation of the [Divisive Concepts Statute]" to "initiate a civil action against a school or school district in superior court for legal or equitable relief..." (Emphasis added).

35.     The overbreadth and ambiguity of the statute makes it impossible for teachers to follow and highly susceptible to arbitrary and discriminatory enforcement, particularly by State enabled private citizen "bounty hunters" and informers.

36.     What does it mean, for example, to prohibit teaching that people of one particular group "cannot and should not attempt to treat others without regard" for their age, sex, gender, mental or physical disabilities?  Indeed, our laws *mandate* the accommodation of certain groups of people, including those with mental and physical disabilities, and purposefully treat individuals *with regard* for their chronological age.  What does it mean to prohibit teaching that an individual, by virtue of one's age, cannot make one "inherently superior" or "inherently inferior" to a younger individual?  Here, too, our laws recognize and plainly differentiate "by virtue of one's age."  A 12 year-old cannot get a chauffeur's license in most jurisdictions.  A 90-year old cannot get a paragliding permit or train operating engineer's license in most jurisdictions. Additional examples concretely illustrate the ambiguities:

- Can a teacher discuss, debate, or answer questions in their classroom about the policy of affirmative action, a policy that necessarily treats members of certain identified groups differently and *with regard* for their identification? Can a teacher discuss for example, programs such as the Small Business Association's affirmative action programs for the treatment of disabled individuals, which necessarily treats disabled applicants differently?

- Can a teacher discuss or debate New Hampshire's mandatory retirement age (since 1792) for judges attaining 70 years of age and whether the law ought to force retirement at a certain age in the judiciary or elsewhere?

- Can a teacher discuss or debate the Americans with Disabilities Act and whether the law should accommodate, and *not treat equally*, those who need or require special accommodation?

- Can a teacher discuss the failure of all states to ratify the Equal Rights Amendment, and whether other measures should be taken to ensure women are treated equally with their male counterparts? Perhaps more simply, can a teacher posit that women today, by virtue of their gender, are inappropriately paid less than men?

- Can a teacher discuss why the midnight thrill of a Crawford Notch first vote is a greater testament to democracy than a poll tax, or the limitation on the number of polling places or like constraints on voting? Or that these constraints on voting are impairing democracy or discriminatory to marginalized communities?

The statutory provisions arguably proscribing the foregoing remain on the books, providing a basis for the politically motivated to terrorize or intimidate teachers. As set forth in greater detail below, with the Department and Commissioner of Education permitting, and tacitly encouraging, the formation and deployment of a cadre of informers and bounty hunters to report violations of the statute using the simple expedient of an online complaint, thereby triggering inquiry, and perhaps discipline, the chilling effect of that prospect will have the desired result in many cases, with those fearful of job loss, possible investigation and reputational harm becoming ready prey.

37. Moreover, the Divisive Concepts Statute's constraining mandates squarely collide with long-standing provisions of New Hampshire's law directing what shall be taught. Consequently, New Hampshire's teachers face a situation that is impossible to navigate: if they

attempt to comply with the statute's substantive prohibitions, they could run afoul of New Hampshire's mandatory educational standards; but if they attempt to comply with New Hampshire's long-standing educational standards, they could run afoul of the substantive prohibitions in the Divisive Concepts Statute.[14]

38.     This is not simply a "theoretical conflict."  It is a Hobson's choice that teachers in New Hamshire now are asked to face every day.  Since the start of the school year, teachers across New Hampshire have struggled to understand the scope of what they can and cannot teach and what questions they can and cannot answer under the Divisive Concepts Statute.

39.     Plaintiff Ryan Richman, for example, who teaches world history class at Timberlane Regional High School, in Plaistow, N.H, is facing this dilemma.  He often asks his students to "[f]ind an event in the news, bring it to class, and be prepared to discuss its connections with the past."[15]  "Nine times out of 10, they are stories about oppression.  They're stories about exclusionism. They're about the Rohingya genocide, they're about the Uyghur genocide, which are going on right this second. They're about Black Lives Matter."[16]  He, like many other teachers, is now left wondering whether the Divisive Concepts Statute "will affect his class, or that instruction."[17]

40.     For example, the Divisive Concepts Statute prohibits teaching that an individual, by virtue of his religion or race is "oppressive, whether consciously or unconsciously."  Mr. Richman teaches genocide studies.  In discussions of the expanding influence of China, can Mr. Richman teach about Chinese claims of racial and religious superiority and oppression of Uyghur

---

[14] *See infra,* ¶¶ 63-75.
[15] Ethan DeWitt, *NH teachers consider how 'divisive concepts' law will affect lesson plans,* Valley News (July 14, 2021), https://www.vnews.com/teachers-respond-to-divisive-concepts-legislation-from-41432485.
[16] *See id.*
[17] *See id.*

Muslim women who are raped as part of a supposed re-indoctrination program?[18]  Can he discuss

Russia's oppressive treatment of the Chechen people?  While teaching about genocide and the

Holocaust, which are expressly mandated by the New Hampshire State curriculum, Mr. Richman

worries what he can teach about Nazism, Aryan supremacy philosophy generally, and how white

supremacy still exists today.  Mr. Richman also teaches constitutional law to his high school

students.  He worries whether he can teach about affirmative action, the Voting Rights Act and

the Equal Rights Amendment and whether protections are still needed today, without running

afoul of the Divisive Concepts Statute.

     41.    Elizabeth Dubrelle, who trains teachers on how to teach civics and social studies at

the New Hampshire Historical Society, says it's a blow to an area of education that already lacks

robust standards.  She said that "[s]ocial studies was already hanging on by its fingernail."  She

added, "My concern is that schools will decide that since it's already in peril, it's not worth the

risk and they'll just do the bare minimum."[19]

     42.    Moreover, under New Hampshire law, public school teachers have a five-year

waiting period before they can achieve tenure.  Before a teacher reaches that threshold, school

districts can choose not to renew their contract without strongly stated reasons.  Many believe that

"[t]eachers that are newer, that are more concerned about making sure that they have their jobs

and they have a livelihood, are going to feel the most pressure to kowtow to this political

manipulation of curriculum," Richman said, "not talking about anything that could potentially

ruffle any feathers at the expense of the students."[20]

---

[18] *See* Matthew Hill et al., *'Their goal is to destroy everyone': Uighur camp detainees allege systematic rape,* BBC News (Feb. 2, 2021), https://www.bbc.com/news/world-asia-china-55794071.

[19] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race And Equity in N.H. Schools,* New Hampshire Public Radio (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-continues-over-discussing-race-and-equity-in-n-h-schools.

[20] DeWitt, *supra* n.15.

43.     New Hampshire's Divisive Concepts Statute is not aimed at any existing teaching practice: teachers do not indoctrinate their students or seek to have their students agree or disagree with any particular political viewpoint; rather, they want only to retain the professional integrity and freedom that they have traditionally been afforded under New Hampshire law.  They endeavor to open their students' minds by exposing them to a wide variety of materials, viewpoints and challenging concepts, without risking their careers or their district's funding. They seek to help children learn *how* to think, not *what* to think. The statute's vague and broad language unfairly chills teachers' attempts to do their jobs and teach a wide range of materials and viewpoints.

44.     And the consequences for a teacher for violating the Divisive Concepts Statute's broad prohibitions are stark.  They include disciplinary proceedings that can lead to dismissal and reputational disgrace.  *See* RSA § 193: 40 (IV).  Strict enforcement of the State's mandate permitting only a single interpretation of American history with these consequences is directly analogous to the actions, past and present, of totalitarian states.[21]   Certainly this is not consistent with a free society or the principles that underlie "Live Free or Die."

45.     Sadly, there is today no shortage of culture warriors – politically-charged groups and individuals – who remain laser focused on persecuting public school teachers and preventing them from teaching accurate history.  In fact, just this month "Moms for Liberty NH," a group devoted to the nonexistent problem of critical race theory in public schools, announced a bounty,

---

[21] The Nuremberg Laws, though initially focused on Jews, applied with equal force to Blacks and other minorities. *See The Nuremberg Race Laws,* Holocaust Encyclopedia, United States Holocaust Memorial Museum, https://encyclopedia.ushmm.org/content/en/article/the-nuremberg-race-laws (2021) (last accessed Dec. 10, 2021). *Cf.,* James Q. Whitman, *Hitler's American Model,* Princeton Univ. Press (Feb. 21, 2017) (Discussing the impact of America's Jim Crow laws on the Nuremberg laws and Nazi Germany). *See also* Austin Ramzy & Chris Buckley, *The Xingiang papers: 'Absolutely No Mercy': Leaked files expose How China Organized Mass Detention of Muslims,* N.Y. Times (Nov. 16, 2019), https://www.nytimes.com/interactive/2019/11/16/world/asia/china-xinjiang-documents.html.

a $500 reward, for any individual who reports a teacher violating the ban on "divisive concepts",

thereby triggering Department of Education inquiry, and perhaps more.[22]



The Moms for Liberty NH "bounty" came hand-in-hand with Commissioner Edelblut's and the

Department of Education's effort to create an avenue for informants to inform on public school

teachers. Indeed, the Twitter "bounty" followed just two days after Commissioner Edelblut

created a website and form to report complaints against teachers.[23] Shades of the authoritarianism

of totalitarian states are inescapable. These parallel efforts will undoubtedly chill responsible and

ethical teaching about our nation's history. Public school teachers now have a target on their

backs, and Commissioner Edelblut and the Department of Education have opened a pathway for

political extremists to instigate ideologically-motivated investigations that may lead to the

---

[22] Paul Blest, *An Anti-CRT Group Is Offering People $500 to Snitch on Teachers,* Vice News (Nov. 15, 2021), https://www.vice.com/en/article/y3vga5/anti-crt-group-offering-teachers-money-new-hampshire.

[23] New Hampshire Dep't of Educ., *Right to Freedom from Discrimination in Public Workplaces and Education*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination (last accessed Dec. 10, 2021).

discipline and possible loss of professional credentials of teachers and administrators across the State.

46.     The Divisive Concepts Statute has brought partisanship into our classrooms and ignited the fires of confrontation and discord in New Hampshire communities.  To illustrate, that conflagration has been kindled, of all places, on an official website created and controlled by the Defendant New Hampshire Commissioner of Education.  Indeed, the Commissioner's website demonstrates how the Divisive Concepts Statute's alleged neutrality and overbreadth can be used for political purposes to target teachers directly.  Under the Divisive Concepts Statute, complaints for violations of the statute may be brought by the aggrieved as a formal civil action in superior court or with the New Hampshire Commissioner of Human Rights against a school or school district.  RSA § 193:40(III).  The Department of Education website provides a link to facilitate the filing of complaints against teacher "…for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating …" matter in violation of the Statute[24].  It then lists a series of reference works.

47.     Studiously omitted however, is the Attorney General's September 7, 2021 formal opinion No. 2021-01, which expressly states that the Statute was viewed as "…confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."[25]  As set forth in greater detail below, the Opinion makes clear that in the view of the Attorney General the Divisive Concepts Statute required some 9-pages of non-binding clarification because vague and confusing.  Significantly, however, that attempt at clarity is wholly omitted from the Education Department's website months after issuance of the Opinion (*i.e.*, at the time of filing of this Complaint) despite the citation of other reference works. One result is to facilitate the

---

[24] *See supra*, n.23.
[25] Attorney General Opinion No. 2021-01, *supra,* n.2.

improper filing of complaints asserting supposed violations alleging conduct and stimulating investigation, reputational harm and burden through the Department of Education, with the attendant dangers of arbitrary and discriminatory application.

      *B.*      *The FAQs and Attorney General's Opinion*

48.     Since its passage, the State has attempted on at least two occasions, in an FAQ document issued in July and in a September 7, 2021 Attorney General's opinion, Opinion No. 2021-01, to clarify the language and narrow the meaning of the uncontrovertibly vague and confusing Divisive Concepts Statute.

49.     The mere fact that the initial guidance was immediately needed and, two months after it was provided, one of the authors of the initial clarification (the July FAQ's)—the Department of Human Rights – acknowledged it was confused and required clarification as to the very nature and scope of the Divisive Concepts Statute, highlights not only the ambiguity of the Statute, but also the perception that, in its quest to stifle speech and ban important and difficult discussions of race, even an enforcer of the Statute finds it inherently "fuzzy."  Significantly, however, while both efforts to try to remedy the flaws in the legislation seemingly move the needle towards a more comprehensible (albeit redundant) law, the FAQ and Attorney General Opinion still leave ambiguity and have no dispositive legal force.  Indeed, it is as if the Attorney General (and even those who lent their names to initial FAQ's) are saying to those who read and rely on these successive restatements of the Statement "*the Legislators really did not mean what they enacted*"; yet, the law, as they enacted it, is still the law and is being used by the DOE and its Commissioner, as well as their cadre of informers and bounty hunters, to confuse, intimidate and bully teachers who have no idea if and when they teach according to the educationally-prescribed curriculum, or answer forthrightly a student's question, they will be pilloried, shamed or fired. Until substantially recast or nullified, the Divisive Concepts Statute remains the vague law of

New Hampshire, largely unintelligible by those intended to be affected and in direct conflict with the United States Constitution and New Hampshire's education laws. A few examples of the FAQ's attempt to seemingly correct the defective legislation emphasize the point.

50. First, the FAQ sets out to define certain terms of the statute. In a section entitled, "What do the phrases 'inherently superior or inferior'" or 'inherently racist, sexist, or oppressive' mean?,'" the FAQ tries to clarify this ambiguity, explaining that "'[i]nherent' means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors."[26]

51. Second, in a section entitled "Does the law prohibit teachers from teaching U.S. history," the FAQ seeks to temper the impact of the Divisive Concepts Statutes, stating that nothing therein precludes teachers from teaching historical subjects (like slavery or Jim Crow) or discussions relating to current events (like the Black Lives Matter movement), or even efforts to promote equality and inclusion, or other contemporary events that impact "certain identified groups."[27] It also indicates that topics relating to racism, sexism or other beliefs that make students, faculty or parents uncomfortable will not *automatically* violate the statute.[28] The use of the term "*automatically*" is telling. How is a teacher to know what topics will violate the statute if it is not "automatically" enforceable? Who or what triggers enforceability? If, for example, a student asks about current policies that attempt to correct for historical racism, sexism or other oppression, such as affirmative action, may the teacher respond by providing examples of the appropriateness or inappropriateness of such measures?

52. Finally, while the statute indicates that it should not be construed to prohibit discussing, "as part of a larger course of academic instruction, the *historical existence* of ideas

---

[26] *See* FAQ.
[27] *See id.*
[28] *See id.*

and subject[s]" such as discrimination and racism, the FAQ suggests that discussion of historical practices may also include a discussion about how these practices "continue to harm certain identified groups" and "their lingering impact."  Again, the line between teaching or describing the "lingering impact" or "continue to harm" of racism and sexism in our country versus how or whether these issues can or should be affirmatively addressed appears to be intentionally blurred, so as to leave teachers in grave doubt regarding what they can and cannot say or teach in their classrooms.[29]

53.    The FAQ's did not resolve the all of the inherent flaws in the Divisive Concepts Statute and neither has the September 7, 2021 Opinion of the Attorney General.  In response to the request from the Chair and Executive Director of the Commission for Human Rights to clarify the "scope and application" of the Divisive Concepts Statute, the Attorney General framed his own set of questions issued a series of questions regarding ambiguities in the law and attempted to address them.  The Attorney General frankly admits that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."

54.    Importantly, as previously noted, the Attorney General's September 7th Opinion has seemingly been wholly ignored by the Department of Education, the entity that directly interacts with teachers and administers potential discipline.  The refusal to even cite it is telling, especially because the Opinion makes clear that the Statute must be recast in fundamental respects and provides the beginning of a roadmap to fundamental interpretative restatement of the fatally flawed Divisive Concepts Statute that this Court may employ through Declaratory Relief.

_____

[29] It should not go unnoticed that in the same FAQ that attempted to "address[] questions that may arise regarding the changes to schools and educational programs," the Department of Education tacitly encouraged informers, pointing out that any "student or parent" may file a complaint with the New Hampshire Commission for Human Rights, Attorney General or file a civil claim in superior court for damages or injunctive relief.

55.     In stark contrast with the Divisive Concept Statute, the Attorney General's Opinion expands the permissible scope of teaching, advising, for example, that, while the statute is silent on the matter, the Divisive Concepts Statute should not be viewed as prohibiting and does not "prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups."  The Attorney General also suggests that educational programs may teach "participants about disparities that may exist among different identified groups, the current or historical practices that may have contributed to those disparities, or about concepts such as implicit bias."  That small but significant substantive step forward does not however make the statute as a whole readily understandable neither, we must stress, is it enforceable, especially in the private actions seemingly encouraged by the DOE.

56.     The Attorney General's Opinion itself  makes clear that even after the FAQ restatement, ambiguities remain that are unresolved.  What does it mean to teach about "disparities that may exist among different identified groups" and "historical practices" that may have led to the disparities?  Can teachers in New Hampshire teach not only the historical existence of segregation and Jim Crow and its impact on America, even today, but also remedial proposals to address ongoing racial inequity?  Can Mr. Richman, for example, teach or have his students debate whether certain voting rights laws that restrict voting for certain groups constitute racially charged "modern day Jim Crow" laws?  Can his students debate affirmative action or question whether race pays a role in police shootings today? Can those students be permitted to discuss voter registration or reinstatement laws and procedures?  Certainly, the Attorney General's Opinion moves in the direction of statutory clarity, but it does not provide enforceable guidance or cure the statute's facial infirmities.

57.     Moreover, regardless of how the FAQ or the Attorney General's Opinion seek to explain how the statute *ought* to be enforced, the statute provides for *a private right of action* for any person , who may initiate a civil action against a school or school district, for their individual dissatisfaction with curricular choices.  "Any person"—not even limited to someone with a child in a public school—may "initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights." Such a delegation of enforcement power is troubling insofar as it turns citizen on citizen, and encourages a culture of surveillance and vigilantism. But even more worrisome is the likelihood that in response to such actions, the Divisive Concepts Statute will undoubtedly be enforced in arbitrary ways—leaving teachers unable to predict what lesson plans or classroom discussion is tolerated by the statute and which ones run afoul of it.

58.     When enforcement power is dispersed and privatized in this manner, there is no consistency in how a law is enforced, which heightens the harm attributable to the unconstitutional vagueness of the Divisive Concept Statute. No single, publicly-accountable body sets enforcement priorities.  Instead, individuals are left to determine, without any prior approval or oversight, when a complaint should be prosecuted and why. Individuals have maximum discretion—and minimal oversight. The problem with such private delegation of power is exacerbated when a statute has no fixed meaning, like the Divisive Concepts Statute here. Individuals will have unchecked authority to bring cases under their interpretation of the statute. They will not have to abide by or even read (or have ready access) to the conflicting policies set by the Department of Education or the Attorney General, flouting the guardrails of due process. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (describing the risk of

"frivolous complaints" when the "universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations").

59.     And while the courts may rebuff the most extreme interpretations put forward, the mere fact that individuals can enter court with those interpretations in the first place does damage enough: it will chill the speech of teachers who do not want themselves, their schools or their school districts hailed to court on their behalf, and who worry about the reputational harm that would undoubtedly result. Moreover, every day that debate is stifled, the students of New Hampshire suffer, and are put at a competitive disadvantage in a complex, multi-cultural world.

60.     The private delegation of enforcement authority—combined with the vagaries of the statute—will simply embolden those with the most polarizing views, who will seek to use this new power that they have been granted to put pressure on teachers. Teachers will teach with the eyes of these extremists on them, and will no doubt feel compelled to change their lesson plans accordingly.  Simply put, the guidance set forth in the FAQ or the Attorney General's Opinion will not stop the white nationalists, for example, who have bombarded New Hampshire school board meetings,[30] or "Moms for Liberty NH," from attempting to use the statute's vague and easily adaptable language to serve their own political purposes.  It has not stopped the bounty hunters from accessing the Commissioner of Education's newly established website and offering 500 pieces of silver to those who point the finger of accusation, merited or not.

61.     Time and again, history has demonstrated that the first effort of advocates of totalitarianism is to censor education and understanding.  The failure, as exemplified by the initiators and facilitators of the Divisive Concepts Statute, to learn that lesson, would, to paraphrase the noted philosopher Santayana, condemn us all to relive the darkest hours of history.

---

[30] *N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations,* NEW HAMPSHIRE PUBLIC RADIO (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

62.     In reality, the broadly drawn Divisive Concepts Statute was designed to prohibit forthright and balanced teaching by limiting New Hampshire's students and future generations' awareness and understanding of our shared history, along with the broadest spectrum of philosophies, viewpoints and approaches.  This, in turn, deprives New Hampshire students of the well-rounded and competitive ability to critically analyze and confront effectively facts and ideas that are in broad circulation in the modern economy. The Divisive Concepts statute is an imprecise and overwrought effort to cabin the teaching of our country's history of racism, sexism, homophobia and the like to static, historical events rather than a continuing struggle for justice. This "Big Brother" approach directly interferes with the competent functioning of public school classrooms.  This suppressive measure seeks to conceal our historical flaws such as the ill-treatment of certain groups of people in this country (whether the Quakers in early New England or African Americans in the Deep South or Asians-Americans during World War II and other victims of blind intolerance), thereby attempting to create ill-educated students unaware of our national commitment and struggle towards equality for all.  In the process, it deprives New Hampshire students of understanding and appreciating the heroic measures undertaken to secure positive change and the arguments advanced both in favor of and against change.

63.     Plaintiffs thus call upon this Court to resolve an issue of significant constitutional import: to declare the Divisive Concepts Statute constitutionally void for vagueness or otherwise invalid, or, alternatively, to declare in simple declaratives what curriculum – the basic legislatively outlined curriculum historically adopted or some constitutionally acceptable modification thereof – teachers may safely employ so that they do not violate the Divisive Concepts Statute's vague strictures. Without this Court's specific declaratory guidance, teachers, including Plaintiffs, have no fair notice of what curriculum is acceptable in practice.  And it

merits emphasis that that declaration will in no way diminish or adversely impact the nature, scope or enforceability of New Hampshire's longstanding and sweeping laws, regulations and enforcement structure aimed at proscribing discrimination in the schools, the workplace and in society in general.

64. Accordingly, Plaintiffs invoke this Court's Declaratory Judgment jurisdiction to declare that the Divisive Concepts Statute is void for vagueness, violative of the U.S. and New Hampshire constitutions and invalid under New Hampshire state law or, alternatively, to build upon the Attorney General's interpretation a substantially recast version that eliminates those fatal flaws and permits New Hampshire teachers to teach and its students to learn the lessons they require for their future careers, lives and civic participation.

## SPECIFIC FACTUAL ALLEGATIONS

A. *Teaching American History, Social Studies, and Current Events in New Hampshire's Schools*

65. New Hampshire courts have a long history of ensuring that New Hampshire schools are properly educating its children.

66. In a series of cases going back to 1993, the New Hampshire Supreme Court has held that the State has an obligation to provide and fund a constitutionally adequate elementary and secondary education for all and that it is for the legislature and the Governor to define the parameters of the education mandated by the State Constitution. *Claremont Sch. Dist. v. Governor*, 138 N.H. 183 (1993) (*Claremont I*); *Claremont Sch. Dist. v. Governor*, 142 N.H. 462 (1997) (*Claremont II*); *Claremont Sch. Dist. v. Governor*, 147 N.H. 499 (2002) (*Claremont III*).

*Accord Contoocook Valley Sch. Dist. v. State,* 174 N.H. 154 (2021)[31]; *Londonderry Sch. Dist. SAU No. 12 v. State,* 154 N.H. 153 (2006).

67.     Consistent with those rulings, the Legislature has statutorily codified the parameters of an adequate education.  The State's overarching policy is to "provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come."  *See* RSA § 193–E:1(I).  The legislature views "[a] well-educated populace [a]s essential for the maintenance of democracy, the continued growth of our economy, and the encouragement of personal enrichment and development."  RSA § 193–C:1.

68.     As set forth in New Hampshire's state law, the criteria for an "Adequate Public Education," includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens."  *See* RSA § 193–E:2(IV).  It also includes "Grounding in . . . literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas."  *See* RSA § 193–E:2(V).

---

[31] "The State does not contest the underlying law applicable to the issues in this case. Under our education funding jurisprudence, Part II, Article 83 of the State Constitution 'imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding.' *Claremont School Dist. v. Governor*, 138 N.H. 183, 184, 635 A.2d 1375 (1993).

To comply with that duty the State must "*define an adequate education, determine the cost, fund it with constitutional taxes, and ensure its delivery through accountability.*" *Londonderry Sch. Dist. v. State*, 154 N.H. 153, 155-56, 907 A.2d 988 (2006) (quotation omitted).  The plaintiffs do not challenge the constitutionality of the definition of an adequate education set forth in RSA §193-E:2-a (Supp. 2020).  Rather, the plaintiffs' grievance is that the State is not fulfilling its constitutional duty because local school districts require substantially more funding than the State currently provides under RSA 198:40-a, II(a) in order for them to deliver the opportunity for a constitutionally adequate education, as defined in RSA 193-E:2-a, to the public school children in New Hampshire."

*Contoocook Valley Sch. Dist. v. State*, 174 N.H. at 274 (Donovan, J. Opinion).

69.     Indeed, New Hampshire's Legislature sets forth minimum standards for "Instruction in National and State History and Government."  RSA § 189:11.  New Hampshire law requires that "[i]n all public and private schools in the state there shall be given regular courses of instruction in the history, government and constitutions of the United States and New Hampshire. . . ."  *See* RSA § 189:11(I).  Specifically, *at a minimum*, courses must include instruction on:

> (b) Skills to effectively participate in civic affairs.
>
> ….
>
> (j) How intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination *have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices.*

*See* RSA § 189:11(I)(j) (Emphasis added[32]).

70.     In furtherance of the above-stated educational goals and advancing its underlying objectives, the State's public policy has long demanded that discrimination of any kind be barred from its public schools, mandating instead that schools and education are neither the vehicles for nor a means by which discrimination may lawfully be advanced.

71.     Accordingly, the New Hampshire legislature has barred:

> discrimination in public schools because of . . . age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin.

RSA § 354-A:27.

72.     Moreover, Chapter Ed 300 of New Hampshire's Education laws addresses the "Administration Of Minimum Standards In Public Schools."[33]  As stated by the legislature, social

---

[32] The Divisive Concepts Statute by its terms limits such teaching as is permitted to the teaching of "existence" not, as mandated by law, its past, present and prospect evolution into "genocide or mass violence."  By so doing, the Divisive Concepts Statute in critical terms stands squarely in conflict with RSA § 189:11(I)(j).

studies programs should give students an opportunity "to acquire the knowledge, skills, and attitudes necessary for effective participation in the life of the community, the state, the nation, and the world."[34] Middle schoolers must therefore receive "[s]ystemic instruction and activities designed to enable students to . . . [a]cquire and use information to clarify issues and seek solutions to societal problems. . . ."[35] High schoolers must "acquire knowledge and modes of inquiry in the areas of civics, economics, geography, world history, and United States and New Hampshire history. . . ."[36]

73.     Specifically, New Hampshire promulgated a "k-12 Social Studies New Hampshire Curriculum Framework"[37] (last approved by the N.H. DOE in July 2006), setting forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level. The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world." To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts."[38]

74.     These Standards and Benchmarks encourage, among other things, the development of research and inquiry skills, critical thinking and analysis, the ability to discern between fact and opinion, the use of primary and secondary sources, and a deep understanding of the unvarnished

---

[33] Chapter Ed. 300, Administration of Minimum Standards in Public Schools, http://www.gencourt.state.nh.us/rules/state_agencies/ed300.html (last accessed Dec. 10, 2021).
[34] *Id.* at 306.46(a)(4).
[35] *Id.* at 306.46(b)(4)(a).
[36] *Id.* at 306.46(c)(1).
[37] K-12 Social Studies New Hampshire Curriculum Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2 (June 2006) (last accessed Dec. 10, 2021).
[38] *Id.* at 5.

story of our nation's history, as well as that of the world.  They highlight ten curricular themes as creative approaches to social studies to encourage higher-order thinking in students.[39]  The first theme is "Patterns of Social and Political Interaction," which includes: "human rights issues, the changing role of women in the economy, immigration issues, and slavery."[40]  Themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics."[41]  For grades 9-12, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women).[42]  An understandable and robust education program thus is outlined and can be followed to benefit our children now and in the future.

75.    Consistent with these standards, on December 14, 2017, Governor Sununu also established an Advisory Council on Diversity and Inclusion pursuant to Executive Order 2017-09.[43]  The Council is charged with working cooperatively with the New Hampshire Commission for Human Rights, the Civil Rights Unit of the New Hampshire Department of Justice, and any other relevant State entities to:

- Review and analyze New Hampshire laws, regulations, and agency policies and procedures, and recommend changes or amendments, where necessary, to further combat discrimination and advance the ends of diversity and inclusion;

- Identify and recommend ways in which the State can support local and community efforts, through educational programs or otherwise, to combat discrimination and advance diversity and inclusion;

- Identify and recommend ways in which the State can partner with non-governmental organizations to combat discrimination and advance diversity and inclusion; and

---

[39] *Id.* at 7.
[40] *Id.* at 9.
[41] *Id.* at 11.
[42] *Id.* at 62; 100.
[43] Gov. Chris Sununu, Governor's Advisory Council on Diversity and Inclusion, https://www.governor.nh.gov/diversity (last accessed Dec. 10, 2021).

- Identify and recommend revisions to RSA 354-A and the scope of the duties of the Commission for Human Rights to combat discrimination and advance diversity and inclusion.[44]

76.     Taken together, these Standards, Benchmarks and diversity initiatives are intended to teach students in New Hampshire public schools to be educated, informed, inclusive, critically thinking and engaged public citizens.

77.     To be clear, despite the misinformed political rallying cry, none of the lessons and activities outlined in New Hampshire curricular law require the teaching of CRT to primary and secondary school students.  CRT is "a practice of interrogating the role of race and racism in society that emerged in the *legal academy* and spread to other fields of scholarship."[45]  CRT developed from the Critical Legal Studies (CLS) movement, "which argued that the law was not objective or apolitical" in the 1970s, and expanded its reach to examination in law schools in the 1980s and 1990s.[46]  As Kimberlé Williams Crenshaw, one of the leading scholars of CRT, notes, CRT "is considered to be an evolving and malleable practice [that] critiques how the social construction of race and institutionalized racism perpetuate a racial caste system that relegates people of color to the bottom tiers."[47]

B.     *The Legislature Promulgates A Sweeping, Politically-Motivated, and Vague Ban on Teaching So-Called Divisive Concepts Such as Gender, Age, Sexual and Racial Discrimination*

78.     It is in the context of New Hampshire's longstanding judicial and legislative commitment to a well-rounded public education and emphasis on diversity and inclusion that

---

[44] *Id.*

[45] Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 12, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/ (emphasis added).

[46] *Id; see also* Kimberlé Williams Crenshaw, *Twenty Years of Critical Race Theory: Looking Back to Move Forward*, 43 Conn. L. Rev. 1253 (2011), https://scholarship.law.columbia.edu/faculty_scholarship/2864 (last accessed Dec. 10, 2021).

[47] Janel George, *A Lesson on Critical Race Theory*.

makes the Legislature's sudden obeisance to the extremist political winds of the day in the Divisive Concepts Statute so jarring.

79.     On January 12, 2021, Keith Ammon, a majority member of the House of Representatives introduced New Hampshire House Bill HB 544, titled an act "relative to the propagation of divisive topics."[48]  Disingenuously framed under the banner of national "unity," the bill's introducing sponsor unapologetically indicated at the legislative hearing for the bill that he did not believe in systemic racism and likened individuals who conduct diversity and inclusion trainings to "snake oil salesman."[49]  The bill prohibited the teaching of so-called "divisive concepts" and threatened to financially penalize public employees, private businesses and current and prospective state contractors for teaching or training on supposed "divisive concepts" related to race and sex.  Divisive concepts were defined as claims that individuals in New Hampshire or the United States were "fundamentally racist or sexist" or that "by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others."  Governor Sununu threatened to veto HB 544 if it was enacted, so the bill was ultimately tabled.

80.     Meanwhile, the 2022-23 State Biennial Budget had to be adopted before July 1, 2021—the commencement of the new fiscal year—in order to avert a shutdown of all state operations.  The House and Senate each adopted separate budget bills, requiring reconciliation by a Joint Conference Committee chaired by the Chairman of the House Finance Committee.  The Chairman went on record stating that the "divisive concepts" provision needed to be included in the budget bills as a prerequisite to getting House votes for passage of HB1 (the budget measure).

---

[48] NH House Bill 544 (May 7, 20201), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[49] Eileen O'Grady, "*N.H. lawmakers debate banning schools from teaching about systemic racism and sexism*," CONCORD MONITOR, (Feb. 18, 2021), https://www.concordmonitor.com/Education-bill-would-ban-teaching-racism-sexism-38821767.

81.    With the deadline for adoption of HB 1 looming, and the specter of mandatory shutdown of State operations present, a *quid quo pro* solution suddenly "materialized." The Senate re-wrote HB 544 to expand its scope. The new bill created RSA § 193:40 (June 25, 2021) (the "Teaching Discrimination Statute"), which was included (by way of amendment) as part of HB2, the Budget Bill's companion measure calculated to force adoption of a Biannual Budget and avoid shutting down State operations.

82.    On June 24, 2021, HB1 and HB 2 were enacted just before expiration of the budgetary deadline and signed by the Governor on June 25, 2021. HB2 was trumpeted as an anti-discrimination measure and righteously captioned "193:40 Prohibition on Teaching Discrimination."

83.    By its terms, HB 2 includes a provision on "Prohibition on Teaching Discrimination," which applies only to public employees. It provides that:

*Prohibition on Teaching Discrimination.*

    I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

        (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

        (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

        (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

        (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical *existence* of ideas and subjects identified in this section.

III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education. (Emphasis added).

84.     More than half of Gov. Chris Sununu's Advisory Council on Diversity and Inclusion, including both local members, resigned in protest of Sununu's decision to sign into law the Divisive Concepts Statute.[50]  They wrote that the law "aims to censor conversations essential to advancing equity and inclusion in our state, specifically for those within our public education systems, and all state employees.  This will directly impact those who are working with some of our state's most vulnerable populations, including educators, child welfare workers, and law enforcement."[51]

85.     The Advisory Council on Diversity and Inclusion also maintained that the Divisive Concepts Statute was "in direct conflict with the stated purpose of the Council laid out in your 2018 Executive Order instructing us to identify ways to "combat discrimination and advance diversity and inclusion."[52]

---

[50] Caleb Symons, "*10 resign from state's diversity over 'divisive concepts' law*,  SENTINEL (June 29, 2021), https://www.sentinelsource.com/news/local/10-resign-from-states-diversity-panel-over-divisive-concepts-law/article_c7c08f8e-e7a2-5a12-ba8a-7f5f3b43d33a.html.
[51] *Resignation letter*, (June 29, 2021) https://www.aclu-nh.org/sites/default/files/gacdi-resignation-letter.pdf.
[52] *See id.*

86.     Lest there be any doubt that the Divisive Concepts Statute was meant to be a solution for the non-existent problem of mandatory teaching of CRT, New Hampshire's public figures have repeatedly reaffirmed it.

87.     Defendant Frank Edelblut advanced the charge, stating that "our basic values are at risk if teachers claim that racism played a critical role in American History."[53]  He stated in a tweet:




**Frank Edelblut** ✔
July 8 at 6:58 AM · 🌐

SOME IN MEDIA ARE EXPRESSING CONCERN ABOUT OUR NEW NH LAW STOPPING DIVISIVE CRITICAL RACE THEORY FROM BEING TAUGHT IN OUR SCHOOLS. As you may know, I support this new legal language in New Hampshire. Here is how public radio recently described the new law. I would like to know - doesn't this make sense to you?  Public radio: "So, the law is called the Right to Freedom From Discrimination in Public Workplaces and Education. Basically, it bans advocating or teaching that certain groups of people are inherently racist, sexist or otherwise oppressive, even if unconsciously. And it also promotes teaching that people should treat others without regards to their differences. So, basically equal treatment of everyone, regardless of race, gender, disability, any other category." … Well this certainly makes sense to me.

👍 224                                                    438 Comments  68 Shares

88.     Rep. Ken Weyler (R-Kingston), House Finance Chair, who supported the Divisive Concepts Statute, considered CRT to be a "Marxist, anti-American, anti-White" program.[54]

89.     And since passage of the Divisive Concepts Statute, New Hampshire Governor Sununu has tried to distance himself from CRT:

- "The ideas of Critical Race Theory and all of this stuff, I personally don't think there's any place for that in schools. . . .";[55]

- He "doesn't like Critical Race Theory as much as anyone";[56]

[53] David Scannell, *Much ink has already been spilled about HB 544, the so-called 'divisive concepts' bill – here's some more* (June 15, 2021), https://manchesterinklink.com/much-ink-has-already-been-spilled-about-hb-544-the-so-called-divisive-concepts-bill-heres-some-more/.
[54] Damien Fisher, *Compromise Sought on Anti-Critical Race Theory Bill,* NH JOURNAL (April 19, 2021) https://nhjournal.com/compromise-sought-on-anti-critical-race-theory-bill/.
[55] Michael Graham, *Sununu: I Don't Like Critical Race Theory, But I Won't Ban It, Either,* NH J. (April 8, 2021) https://nhjournal.com/sununu-i-dont-like-critical-race-theory-but-i-wont-ban-it-either/.
[56] *See id.*

90.     New Hampshire has a long and rich history, particularly in the field of public education.  The first publicly funded school was opened in Hampton, N.H. some 372 years ago, on May 31, 1649.  The sole qualification for admission was that girls and boys be "capable of learning."[57]  New Hampshire also has a well-established constitutional, legislative, and administrative regimen ensuring that as a matter of public policy:

> [P]ublic elementary and secondary education shall provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come. . . .

RSA § 193-E:1.  However, as one of only six states to pass a law restricting certain kinds of teaching on race and gender, the law has had its intended purpose of thrusting New Hampshire to the forefront of the culture wars, questioning a noble educational heritage.

91.     Reopen NH, which organized against COVID restrictions and masks during lockdown, has been posting about Critical Race Theory and urging people to attend school board meetings. So have some white nationalist groups.[58]  As noted, Moms for Liberty NH has offered a bounty on public school educators who the informant believes have strayed by "breaking this law" (*see supra*, ¶ 45).

---

[57] Higher education has also long been a hallmark of the Granite State.  Dartmouth College has since 1769 been one of the nation's most respected institutions of learning.  The University of New Hampshire, a public land grant college and research university, was founded in 1893.

[58] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race and Equity in N.H. School,* NEW HAMPSHIRE PUBLIC RADIO (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-continues-over-discussing-race-and-equity-in-n-h-schools.



**ReopenNH**

For those of you starting to organize in your school districts, there is a LOT of ground to cover to restore American education – medical tyranny and coersion (masks, vaccines, etc.) is just one important topic. For those of you also fighting Critical Race Theory in your local schools, check out this briefing book from CRT expert Christopher Rufo: http://christopherrufo.com/crt-briefing-book

**Christopher F. Rufo**

**Critical Race Theory Briefing Book**
A research and policy guide for families, schools, and legislative leaders.

544 👁 Carolyn McKinney, 22:03

92.    HB 2 was not a law passed to end discrimination in New Hampshire public schools, nor was it viewed as such – those laws clearly already exist; indeed it merits emphasis that at best, to the extent HB 2 effects any proper proscription against discrimination it is unnecessarily confusing, wholly redundant of and in a number of instances conflict with long-established and well enforced New Hampshire laws and regulations.  The passage of HB 2, in its watered-down form, was intended to inject partisan politics into New Hampshire's educational regimen by adding New Hampshire and its far right-leaning legislators to the political map and the national conversation surrounding the manufactured and contrived political controversy of critical race theory.  It is, however, unconstitutional and should be invalidated unless the court construes it exceedingly narrowly and substantially recasts it along the lines of the roadmap provided by New Hampshire's Attorney General.

C.      *The Legislature Implemented the Divisive Concepts Statute to Threaten Plaintiffs'*
        *Ability to Teach Freely, Sowing Confusion and Inflaming Tensions*

93.     While the CRT issue is a politically manufactured problem employed by partisan zealots without any basis in reality, teachers face the very real possibility of losing their jobs on account of the Divisive Concepts Statute. Should a "bounty hunter" or Department of Education informant simply chose to identify a teacher as having allegedly violated the Divisive Concepts Statute, an inquisition begins, legal fees become a reality, and a teacher's character, reputation and occupation are jeopardized.

94.     In the FAQ, the New Hampshire Department of Education explained that students and parents that believe their school has violated the Divisive Concepts Statute may simply reach for their computer and file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or a civil claim in the superior court to seek damages or declaratory relief.[59] An educator can also individually face disciplinary sanction by the state board of education for violating the educator code of conduct.[60]

95.     To enforce the Divisive Concepts Statute, Commissioner Edelblut has now created a website to report complaints of teachers allegedly violating the statute and indicated that he will investigate any such claim as educator misconduct, placing a teacher's livelihood in jeopardy. And, as noted, it is Commissioner Edelblut's state-funded website that will be the forum for the proclaimed bounty prize from the Moms for Liberty NH for informers (identified or anonymous).

96.     Thus, any individual – anonymously, if they wish – can report a teacher for teaching history, economics or civics that does not conform to their own personal views of the

---

[59] *See id.*

[60] Pursuant to New Hampshire's Education Law, the state board of education is tasked with adopting rules for disciplinary proceedings, including procedures assuring due process. See RSA § 193–D:2. It also gives the state board of education discretion to adopt "[a] complaint procedure for those asserting that a provision of this chapter has been violated, and possible sanctions and penalties for such violation. . . ." *See id.*

world.  Just two days after the website and complaint form was published, the Moms of Liberty NH announced their "bounty" on teachers.  To put it more concretely, the teacher who assigns a student or a class an oral report on race in America or New Hampshire and receives student work that includes reference to systemic discrimination, could implicate a rush to collect the bounty or file a complaint.  If a current events question is raised concerning the nature and circumstances under which affirmative action was directed in a given circumstance and the teacher explains what was involved, whether it is merited and what other remedies are available, they too could be subject to "bounty hunters."  To most, such debates, even if controversial, are part of a robust and well-rounded education; but now in New Hampshire, teachers must think twice before engaging in these discussions, particularly if teaching is the sole basis for their livelihood.  Mr. Richman's teaching of ethnic and racial genocide is now fraught with danger.  And all of this is the result of partisan political crusade to resuscitate a constitutionally flawed Presidential Executive Order that was judicially enjoined.  Simply by continuing to teach lesson plans about history as they have always been taught in accordance with New Hampshire's education laws, teachers in New Hampshire now risk professional discipline and severe reputational harm.

D.  *It Is Impossible for New Hampshire Teachers to Comply with the Vague Statutory Proscriptions and Universal State Education Standards*

97.    The Divisive Concepts Statute is incompatible with New Hampshire's Constitution, Education Law and curriculum requirements, rendering it impossible for teachers to teach and follow state-mandated Standards and Benchmarks and still comply with the political manifesto.  Part II, Article 83 requires the State to "provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding."  The Supreme Court of New Hampshire considers an "adequate public education" to be a fundamental right.

98.     Thus, an adequate education must include the following curricular subjects:

(b) Skills to effectively participate in civic affairs.

….

(j) How intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices.

RSA § 189:11.

99.     Yet, the Divisive Concepts Statute's prohibition against teaching racial superiority or age discrimination—while also limiting teachers to instruction on the "historical existence of [proscribed] ideas and subjects"—is internally inconsistent with the Education Law's mandate to teach on the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination, and importantly, potential preventive measures. Section 189 requires teachers to teach more substantive history than just the mere "existence" of genocide or mass violence directed by the Divisive Concepts Statute. They are commanded by law to make clear to students "…how to prevent the evolution of such [discriminatory] practices," what solutions or measures have been proposed, their rationale and alternatives  And they should.

100.     Take, for example, Jim Crow. Section 189:11 requires public schools to teach about its evolution: its roots in slavery, its worldwide negative impact, that it was an acknowledged precursor to Hitler's Nuremberg Laws and has frequently been cited by totalitarian states as indicative of this nation's lack of moral fiber. However, the Divisive Concepts Statute *on its face* would directly limit discussion of Jim Crow, permitting teachers to only discuss the "*historical existence*" of Jim Crow. A teacher in American History in New Hampshire cannot tell whether he or she is permitted to take that discussion further to include, for example, how the laws worked and who it benefited, how it impacted the lives of generations past and present and,

in turn, has had a continuing impact on our society and nation, much less what options have been proposed for rectifying it. True, the Attorney General has opined that there is a re-interpretive path to surgically erase and restate certain portions of the Statute, but that does not carry the force of law or bind the private citizens who are empowered under the Statute to enforce it.

101. In June 2006, the New Hampshire Department of Education promulgated "*New Hampshire K-12 Social Studies Curriculum Framework,"*(N.H. Department of Education, 2006)[61]. Among the prescribed educational themes were the following:

> Theme I: Patterns of Social and Political Interaction
>
> This theme focuses on the changing patterns of class, ethnicity, race, and gender in social and political relations.
>
> Examples of these patterns are human rights issues, the changing role of women in the economy, immigration issues, and slavery.

*Id.* at 9. The Divisive Concepts Statute therefore violates Part II, Article 83 and the Education laws and curricular standards promulgated thereunder by diminishing through censorship students' ability to examine how important the history of our country – and recurring issues related to class, ethnicity, race and gender – continue to have a lasting impact on our country— and the proposals for change.

## COUNT I
## VIOLATION OF THE DUE PROCESS CLAUSE AS VOID FOR VAGUENESS AGAINST ALL DEFENDANTS

102. The allegations in paragraphs 1 through 101 are incorporated herein by reference.

103. The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property. It is a basic tenet of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

---

[61] *New Hampshire K-12 Social Studies Curriculum Framework,* NH DEPT. OF EDUCATION (June 2006), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2.

104.     The Divisive Concepts Statute is inherently contradictory and fails to provide

adequate notice and a reasonable opportunity to teachers to know what, precisely, is prohibited.

105.     It forbids teaching the concept that one race or sex is inherently oppressive,

"whether consciously or unconsciously," but specifically carves out from the ban discussing "as

part of a larger course of academic discussion, the *historical existence*" of these ideas and

subjects.  Teachers are permitted to teach about historical "existence" of racism, sexism and other

biases. – *i.e.*, that they existed – but they are *forbidden* to discuss their nature, scope and their

impacts both historically and today, much less proposals on how they can be prevented, an

explicit requirement of the Education Law.

106.     All of the provisions of the Divisive Concepts Statute require highly personal and

amorphous value judgments that are incompatible with the requirement that laws provide clear

notice and due process to those impacted.  The Attorney General's opinion provides some basis

towards statutory clarity but is not binding on this Court nor any citizen individual bringing suit

under the private right of action authorized by the Divisive Concepts Statute.

107.     Plaintiffs have been prevented and chilled from exercising their due process rights

by the vagueness of the Divisive Concepts Statute, its punitive opportunities ranging from

censure, dismissal by their local school board and complete loss of their teaching license by the

State Commissioner of Education, who appears politically motivated to enforcing the law in a

biased and improper fashion.

108.     The overbreadth and vagueness of the law will lead to its arbitrary and capricious

enforcement (whether in governmental enforcement proceedings or private actions by citizens)

and chill constitutionally protected speech.

109.     The vagueness of the law will also lead politically-motivated groups and individuals to use the law to lodge complaints to suit their agendas.

110.     In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their Due Process rights.

111.     As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their due process rights and a declaration that the Divisive Concepts Statute is void for vagueness.

**COUNT II**
**THE CONFLICT BETWEEN THE DIVISIVE CONCEPT STATUTE AND**
**NEW HAMPSHIRE LAW ADDS TO AND UNDERSCORES THE**
**UNCONSTITUTIONAL  VAGUENESS OF THE STATUTE**

112.     The allegations in paragraphs 1 through 111 are incorporated herein by reference.

113.     The Divisive Concepts Statute conflicts with existing New Hampshire law.   Thus, teachers are placed in an unacceptable quandary: if they comply with New Hampshire law, they can be charged with violation of the Divisive Concept Statute and if they comply with the latter they violate New Hampshire Law and the mandated curriculum. That conflict of itself renders the Statute void for vagueness.

114.     The New Hampshire Constitution Part II, Article 83 provides every citizen with a fundamental right to an education.

115.     In *Londonberry Sch. Dist. v. State*, 154 N.H. 153, 155-56 (2006), the New Hampshire Supreme Court tasked the Legislature with setting the parameters for a constitutionally adequate education.

116.     The Legislature subsequently enacted N.H. Rev. State 193-E:2 setting forth a substantive educational program to deliver the opportunity for an adequate education for kindergarten through twelfth grade.  It provided that students shall have "[k]nowledge of civics,

and government, economics, geography, history and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens."   While it left specific curricular choices to local school boards, by statute, the legislature mandated that New Hampshire schools statewide must, at a minimum, instruct on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, *and how to prevent the evolution of such practices*."  RSA 189:11(j) (emphasis added).

117.    The Divisive Concepts Statute rebuffs the New Hampshire Constitution and the Legislature's educational enactments by diminishing through censorship students' explanatory knowledge base.  It permits teachers to teach about the historical existence of a topic, not the substantive concerns, facts, theories and policies surrounding critical events in history, let alone any proposals for ultimate resolution or amelioration of resultant concerns.  *See* N.H. Rev. State 193.40 (I) (a) (precluding any teaching that one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin).  It even casts doubt upon, if not entirely precludes, teaching both or many of the expressed sides of any issues involving the basic matters detailed in N.H. Rev. Sta. 193.40(I)(a). Teachers cannot, among other things, teach about how bigotry and intolerance has evolved and how to prevent the evolution of these practices.

118.    In construing the Divisive Concepts Statute's constitutionality "strict scrutiny" is the applicable test. The Statute prohibits teachers from teaching distinct matter pertaining to

recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race..."). Thus construed, and given the absence of any contrary compelling state interest, the Divisive Concepts Statute fails to pass muster.

119.    Further, New Hampshire law contains a "Freedom of Expression" Act, RSA Chapter 98-E, that reaches broader than the federal First Amendment and allows every public employees "a full right to publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies."  RSA 98-E:1.  By curtailing and chilling teacher speech, the Divisive Concept Statute violates RSA 98-E.

120.    At the very least, because of the litany of state laws that conflict with the Divisive Concepts Statute, it is impermissibly vague and therefore violates Plaintiffs' constitutional right to due process under the New Hampshire Constitution (N.H. Const. pt. 1, art. 12), as well as the Fourteenth Amendment of the U.S. Constitution.

121.    Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in the enforcement or in any application of the unconstitutionally vague Divisive Concept Statute which simultaneously unconstitutionally impairs New Hampshire citizens' rights and violates New Hampshire law.

## COUNT III
## VIOLATION OF THE FIRST AMENDMENT
## AGAINST ALL DEFENDANTS

122.    The allegations in paragraphs 1 through 121 are incorporated herein by reference.

123.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have violated the established rights of Plaintiffs to freedom of speech under the First Amendment of the United States Constitution as applied to the states and their political subdivisions by the Fourteenth Amendment, in that Defendants have censored Plaintiffs' speech by restricting Plaintiffs' proper curricular discretion.  Indeed, it broadly precludes any teaching that relies on

concepts that certain members of the New Hampshire legislature deem offensive, including the idea that individuals may possess implicit or unconscious biases.

124.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have also violated the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution and abridged the public policy of New Hampshire concerning the right of public employees to "publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies" as mandated by RSA Chapter 98-E:1.

125.    Plaintiffs have been prevented and chilled from exercising their rights by threat of disciplinary action, private suit or the loss of their teaching license for violation of the Divisive Concepts Statute.

126.    By its plain terms, violation of the Divisive Concepts Statute is considered a violation of the educator code of conduct, which may result in disciplinary or state licensure action, potentially depriving teachers of their livelihood.

127.    The creation of the Commissioner of Education's website as a recognized vehicle for the filing of formal complaints against teachers for alleged violation of the Divisive Concepts Statute– accessible to anyone with a political agenda, personal grudge or worse – subjects teachers to arbitrary and capricious enforcement of the Divisive Concepts Statute and its draconian consequences.

128.    Plaintiff teachers under threat of Department of Education or private citizen complaint are justifiably forced to self-censor their own free speech to avoid these severe and draconian threats.

129.    The subject matter of the restraint on speech and the issues herein tendered are such to mandate invocation of "strict scrutiny."  Defendants have failed to establish a compelling

state interest that would justify such censorship and the Divisive Concepts Statute cannot and does not survive the "strict scrutiny" test.

130. In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their First Amendment rights.

131. Plaintiffs have no adequate remedy at law for the loss of their First Amendment Rights.

132. As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their first amendment rights to freedom of speech.

## COUNT IV
### DECLARATORY JUDGMENT INTERPRETING THE RULE
### AGAINST ALL DEFENDANTS (DECLARATORY RELIEF)

133. The allegations in paragraphs 1 through 132 are incorporated herein by reference.

134. 28 U.S.C. § 2201 empowers the Court to "declare the rights and other legal relations of any other interested party seeking such declaration, whether or not further relief is or could be sought."

135. The Constitution of New Hampshire likewise accords the judiciary the right to declare the rights of interested parties respecting the validity and scope of state statutes and rules and regulations promulgated thereunder (*See, e.g.*, N.H. Const., Part 2, Art. 72-a).

136. The Divisive Concepts Statute broadly prohibits teachers from teaching distinct matter pertaining to the recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race..."). To illustrate, the Teacher Discrimination Statute prohibits instruction concerning claims of racial superiority (*id.* at (a)) or age discrimination (*id.* at (b)). However, the Divisive Concepts Statute also requires teachers to comply with New Hampshire's Constitution (*e.g.* Part II, Art 83 of the State Constitution as construed and applied by the Supreme Court of

New Hampshire[62]) as well as statewide educational standards that have been in place for decades. This includes N.H. Rev. Stat. Ann. § 189:11 and the statewide "*New Hampshire K-12 Social Studies Curriculum Framework,*" (N.H. Department of Education, 2006), which mandate that students be taught (among other things) about the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination and patterns of class, ethnicity, race, and gender in social and political relations. The Divisive Concepts Statute thus is not only void for vagueness, but it also poses an irreconcilable conflict with state educational provisions, which must be resolved for the sake of New Hampshire's teachers and students.

137. Giving broad meaning to the Divisive Concepts Statute—such that it could prohibit the teaching of materials that otherwise would be in accord with state educational standards—would raise serious questions about whether it violates the New Hampshire Constitution, and accordingly such an interpretation should be avoided.

138. The Divisive Concepts Statute must be limited and construed in a manner that preserves New Hampshire's teachers' abilities to teach the wide variety of materials and concepts mandated by state law. Interpreting the Divisive Concepts Statute to give full force and effect to its broad prohibition, on the other hand, would run afoul of the New Hampshire's Constitution's free speech guarantee because it would be a non-viewpoint-neutral prior restraint on protected speech.

139. Plaintiffs therefore seek a declaratory judgment that:

a) the Teaching Discrimination Statute is void for vagueness, and

b) the Teaching Discrimination Statute and any Regulations promulgated thereunder, as well as, RSA §§ 354-A:30-34, to the extent applicable, are invalid and void under the Constitutions of the State of New Hampshire and of the United States, or, in the alternative,

---

[62] *See, e.g.*, *Claremont School Dist. v. Governor*, 138 N.H. 183, 184 (1993).

c) clarifying that, in accordance with subdivision II of the Teaching Discrimination Statute and the applicable principles and provisions of the Constitution and laws of the State of New Hampshire and of the United States, nothing contained in the Teaching Discrimination Statute, or in. the Contemporaneous Amendments, precludes or limits, nor may the State or any agent or instrumentality thereof, including, without limitation, the New Hampshire Commissioner of Education, employ same to bar or deter, teachers from teaching or students from learning the nature, substance, history, relevant theories and/or existence of ideas, subject matter, events and concerns relating or pertaining to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, past or present;

d) the Teaching Discrimination Statute and any Regulations promulgated thereunder are in conflict with the public policy of the State of New Hampshire,

e) the Teaching Discrimination Statute and the Contemporaneous Amendments are invalid under Part 2, Article 18-a, of the New Hampshire Constitution because an invalid addition to a Budget Bill.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

First, an order declaring the Divisive Concepts Statute unconstitutionally vague in violation of Fourteenth Amendment and First Amendments of the United States Constitutions and New Hampshire Constitutions Part 1, Arts. 12 and 22 (speech and vagueness);

Second, preliminary and permanent injunctions prohibiting Defendants from enforcing the Divisive Concepts Statute against any teacher;

Third, in the alternative, an order declaring the Divisive Concepts Statute must be narrowly construed in order to avoid infirmity under the free speech and due process guarantees of the New Hampshire and United States Constitutions, and therefore, among other things, does not prohibit any New Hampshire teacher from utilizing materials and promoting concepts mandated by or permitted under any New Hampshire law.

And any additional relief this court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated: December 13, 2021

Respectfully submitted,

_____/s/ Peter J. Perroni_____
NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.
David J. Kahne, Esq.
(*pro hac vice* pending)
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

SELENDY & GAY PLLC
Faith Gay, Esq.
(*pro hac vice* pending)
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

AMERICAN FEDERATION OF TEACHERS
David J. Strom
(*pro hac vice* pending)
555 New Jersey Ave. NW
Washington DC 20001
(202) 393-7472
dstrom@aft.org

PHILLIPS, RICHARD & RIND, P.A.
Mark Richard
(*pro hac vice* pending)
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
(305) 412-8322

*Co-Counsel for Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO and individual teachers and parents*